**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

PATRICK MCNEIL,

         *Plaintiff*,

    v.

JEFFREY DUNCAN, *et al.*,

        *Defendants.*

Civil Action No. 19-694 (RDM)

---

**MEMORANDUM OPINION AND ORDER**

Plaintiff Patrick McNeil is a former employee of BAE Systems Corporation ("BAE"), which, along with JRC Systems, Inc. ("JRC"), provides contract support to the Department of the Navy's Strategic Systems Program. Plaintiff initially brought this action *pro se* in D.C. Superior Court against one former and one current employee of the Department of the Navy—Vice Admiral Tony Benedict and Karon Joyner-Bowser—and against two JRC employees—Jeffrey Duncan and Marco D'Eredita. Plaintiff asserted claims for (1) tortious interference with a business relationship, (2) intentional infliction of emotional distress, and (3) defamation. Dkt. 1-1 at 2 (Compl.). In March 2019, the United States certified pursuant to 28 U.S.C. § 2679(d) that Vice Admiral Benedict and Joyner-Bowser "were acting within the scope of their employment as deemed employees of the United States Department of Navy at the time of the alleged incidents." Dkt. 1-2 at 2. The United States then removed the case to this Court and substituted itself as the party defendant in place of Vice Admiral Benedict and Joyner-Bowser. *See id.* All four defendants then moved to dismiss Plaintiff's claims. Dkt. 7; Dkt. 11. The United States moved to dismiss for lack of jurisdiction; Duncan and D'Eredita moved to dismiss for failure to state a claim.

On March 31, 2021, the Court granted the United States' motion to dismiss the claims against it on the ground that the FTCA's waiver of sovereign immunity did not apply.  *See McNeil v. Duncan*, 2020 WL 1536252, at *1 (D.D.C. Mar. 31, 2020).  The Court also denied Duncan and D'Eredita's motion to dismiss without prejudice, explaining that the Court would benefit from further briefing on the question whether the Court retained subject-matter jurisdiction over Plaintiff's claims against Duncan and D'Eredita in light of the Court's dismissal of the claims against the United States.  *Id.* at *5.

On April 20, 2021, with the aid of newly retained counsel and with leave of Court, Plaintiff filed an amended complaint alleging the same three tort claims against Defendants Duncan and D'Eredita ("Defendants").  Dkt. 44.  Defendants now move to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. 45.

For the reasons explained below, the Court concludes that it retains subject-matter jurisdiction over Plaintiff's claims against Defendants and will **DENY** the motion to dismiss as to Counts I and II and **GRANT** the motion as to Count III.

## I. BACKGROUND

Unless otherwise indicated, the following facts are derived from Plaintiff's complaint and are taken as true.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Plaintiff Patrick McNeil was previously married to DeAnna Rhodes.  Dkt. 44 at 2 (Am. Compl. ¶ 11).  In 2014, the couple created online profiles on FetLife.com ("FetLife"), a social networking website that serves people interested in "BDSM." [1]  Dkt. 44 at 3 (Am. Compl. ¶ 16).

---

[1] BDSM "is an overarching abbreviation of bondage and discipline, dominance and submission, and sadism and masochism and refers to a physical, psychological, and sexual role-play involving power exchange between consensual participants."  Nele De Neef et al., Bondage Discipline, Dominance-Submission and Sadomasochism (BDSM) From an Integrative Biopsychosocial Perspective: A Systematic Review, 7 Sexual Medicine 129, 129 (2019).

In 2015, Plaintiff and Rhodes met Jeffrey Duncan and James Crawley through the BDSM

community. *Id.* at 4 (Am. Compl. ¶¶ 17–18).  Duncan worked for JRC.  *Id.* (Am. Compl. ¶ 19).

In April 2016, Rhodes started working for JRC, reporting to Duncan.  *Id.* at 2 (Am. Compl.

¶¶ 10–11).  "As part of her job duties, . . . Rhodes attended work trips out of state with Defendant

Duncan, which Mr. Crawley, [who was] not a JRC employee, would attend as well."  *Id.* at 4

(Am. Compl. ¶ 21).  In May 2016, Rhodes "moved out of the marital home and eventually

moved into Mr. Crawley's home."  *Id.* (Am. Compl. ¶ 22).

On August 2016, Duncan helped Plaintiff secure a job with BAE.  *Id.* at 5 (Am. Compl.

¶ 26); *see also* Dkt. 44-6 at 2.  Like JRC, BAE provides contract services to the Navy's Strategic

Systems Program ("SSP").  Dkt. 44 at 2 (Am. Compl. ¶ 10).  Plaintiff began working for BAE in

support of the SSP in October 2016.  *Id.* at 5 (Am. Compl. ¶ 27).  Around the same time,

Plaintiff "expressed his distress over his marriage to Defendant Duncan," *id.* at 5 (Am. Compl.

¶ 25), and his "mental health began suffering," *id.* (Am. Compl. ¶ 28).

On or about December 28, 2016, Plaintiff "published a website biography detailing his

perspective about Duncan and Mr. Crawley's actions regarding Mrs. Rhodes and his marriage."

*Id.* at 5–6 (Am. Compl. ¶ 29).  The website biography included photos of Rhodes that Duncan

and Crawley had "posted publicly to the FetLife website."  *Id.* at 6 (Am. Compl. ¶ 29).  The

website also "included a reference to [Plaintiff's] current work in relation to the SSP."  *Id.*

Shortly thereafter, Plaintiff learned that he had been banned from the JRC worksite where

Rhodes and Duncan worked.  *Id.* (Am. Compl. ¶ 30).  On January 4, 2017, Duncan confronted

Plaintiff about the website, stating that the JRC "security officer did ban [Plaintiff] [from

entering JRC] past the front desk" and that the website "ma[d]e [Plaintiff] a problem for

[Duncan]."  *Id.* (Am. Compl. ¶ 32).  That same day, Plaintiff removed the photos of Rhodes from

his website.  *Id.* (Am. Compl. ¶ 31).  On January 9, 2017, Rhodes petitioned for and obtained a

preliminary protective order in Fairfax County, Virginia.  *Id.* (Am. Compl. ¶ 33).  On or about

January 24, 2017, Marco D'Eredita, Director of Facilities and Security for JRC, emailed Plaintiff

to advise him not to contact JRC employees about Rhodes and to inform him that JRC was aware

of Rhodes's protective order.  *Id.* (Am. Compl. ¶ 34).

      In or around February 2017, Defendants "reported [Plaintiff's] website as a security risk

to BAE."  *Id.* at 7 (Am. Compl. ¶ 36).  Duncan "requested an in-person meeting with BAE,

which BAE declined."  *Id.*  On or about February 13, 2017, Vice Admiral Benedict "contacted

BAE regarding the reports received from Defendants" and "demanded that [Plaintiff] be

removed from his worksite in D.C."  *Id.* (Am. Compl. ¶ 38).  Around the same time, Duncan also

reported to his supervisors that Plaintiff and Rhodes were divorced—even though they were only

separated—and Duncan "used that misrepresentation to request and receive advanced warning of

[Plaintiff's] travel to the [SSP] work site" in Florida.  *Id.* at 7 (Am. Compl. ¶ 40); *see also* Dkt.

44-8 at 2 (text messages between Plaintiff and Duncan).  Plaintiff's trips to the Florida worksite

were subsequently cancelled.  Dkt. 44 at 7 (Am. Compl. ¶ 41).

      On or about February 15, 2017, BAE "concluded [its] investigation and determined that

[Plaintiff] had not violated any of BAE's company policies, and therefore, did not present a

security risk."  *Id.* (Am. Compl. ¶ 42).  Despite this determination, "a report of Plaintiff's alleged

violation was logged into the Joint Personnel Adjudication System ('JPAS') within the

Department of Defense's personnel security clearance and access database."  *Id.* at 8 (Am.

Compl. ¶ 44).  Over the next several months, Plaintiff (1) was transferred from his worksite in

Washington, D.C. to BAE's worksite in Rockville, Maryland, *id.* (Am. Compl. ¶ 43); (2) had his

security clearance temporarily suspended, *id.* at 9 (Am. Compl. ¶ 51); (3) was eventually

suspended from the Rockville worksite, *id.* (Am. Compl. ¶ 52); and (4) was terminated from BAE on September 6, 2017, *id.* (Am. Compl. ¶ 53).

On January 19, 2019, Plaintiff filed this action *pro se* in the Superior Court against Vice Admiral Benedict, Joyner-Bowser, Duncan, and D'Eredita.  Dkt. 1-1 (Compl.).  He asserted claims for (1) tortious interference with a business relationship, (2) intentional infliction of emotional distress, and (3) defamation.  Dkt. 1-1 at 5–20.  The United States removed the action to this Court, Dkt. 1-1 at 1, citing 28 U.S.C. §§ 1346(b), 1441, 1442(a)(1), 1446, 2401(b), and 2671–80.  That same day, the United States certified pursuant to the Westfall Act, 28 U.S.C. § 2679(d), that Vice Admiral Benedict and Joyner-Bowser "were acting within the scope of their employment . . . at the time of the alleged incidents" and substituted itself as a party defendant in their place.  Dkt. 1 at 2.  The United States then moved to dismiss the claims against it for lack of jurisdiction on the ground that the FTCA's waiver of sovereign immunity, 28 U.S.C. §§ 1346, 2671–2680, did not cover Plaintiff's claims.  Duncan and D'Eredita also moved to dismiss, arguing that they were "entitled to absolute immunity" from suit for informing the Navy about issues potentially affecting Plaintiff's security clearance and that, in any event, the complaint did not state a claim upon which relief can be granted.  Dkt. 11.

On March 31, 2020, the Court granted the United States' motion to dismiss for lack of jurisdiction.  *See McNeil v. Duncan*, 2020 WL 1536252, at *1 (D.D.C. Mar. 31, 2020).  As a threshold matter, the Court concluded that the United States was properly substituted for Vice Admiral Benedict and Joyner-Bowser under the Westfall Act.  *McNeil*, 2020 WL 1536252, at *3–5.  The Court then concluded that the FTCA barred Plaintiff's intentional tort claims against the United States.  *Id.* at *5.  The Court also denied Duncan and D'Eredita's motion to dismiss without prejudice, on the ground that the Court would benefit from further briefing on the

5

question whether the Court retained subject-matter jurisdiction over Plaintiff's remaining state-law claims after having dismissed the claims against the United States for lack of jurisdiction. *Id.* at \*8.  The Court, accordingly, ordered the parties to show cause why it should not dismiss or remand to the Superior Court for lack of subject-matter jurisdiction.  *Id.*

On March 29, 2021, Plaintiff moved for leave to file an amended complaint in light of his recent retention of counsel.  Dkt. 42.  The Court granted leave to amend and, on April 20, 2021, Plaintiff filed an amended complaint naming only Duncan and D'Eredita as Defendants.  Dkt. 44.  The amended complaint alleges claims for (1) tortious interference with a business relationship, (2) intentional infliction of emotional distress, and (3) defamation.  Dkt. 44 at 1 (Am. Compl.).  Defendants have once again moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. 45.

## II.  LEGAL STANDARD

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Although "detailed factual allegations" are not required, the complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me allegation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  In assessing a Rule 12(b)(6) motion, a court may generally consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), but may also consider "documents attached

to a motion to dismiss . . . if those documents' authenticity is not disputed, they were referenced in the complaint, and they are 'integral' to one or more of the plaintiff's claims," *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 105 (D.D.C. 2017).

## III.  ANALYSIS

### A.    Subject-Matter Jurisdiction

The Court first addresses whether it has subject-matter jurisdiction now that the claims against the United States have been dismissed.  As discussed, the Court raised this issue *sua sponte* in its prior opinion.  *See McNeil*, 2020 WL 1536252, at *7.  Noting that it lacks diversity jurisdiction under 28 U.S.C. § 1332 and supplemental jurisdiction under 28 U.S.C. § 1367(a), *see id.*, the Court ordered the parties to show cause why Plaintiff's claims against Duncan and D'Eredita should not be dismissed or remanded to the Superior Court for lack of subject-matter jurisdiction.  *McNeil*, 2020 WL 1536252, at *8.  On May 1, 2020, Defendants filed a response to the Court's show cause order in which they argued, among other things, that the Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1442(a).  Dkt. 23.  Plaintiff did not file a response to the Court's show cause order, but his amended complaint asserts that "[j]urisdiction remains proper in this Court."  Dkt. 44 at 2 (Am Compl. ¶ 8).  For the following reasons, the Court now concludes that it has subject-matter jurisdiction over the remaining claims in this case.

To start, the Court had subject-matter jurisdiction over Plaintiff's entire action when the case was removed.  A defendant "may assert multiple grounds for removing a case to federal court," as the United States did here.  *BP P.L.C. v. Mayor & Cty. Council of Balt.*, 141 S. Ct. 1532, 1538 (2021).  One of the statutes that the United States invoked, 28 U.S.C. § 1442(a)(1), provides that "[a] civil action or criminal prosecution that is commenced in a State court and that

is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office" may be "removed by them to" federal court.  28 U.S.C. § 1442(a)(1).  Significantly, Section 1442(a)(1) authorizes removal of an entire "civil action," even if only one of the claims asserted involves a federal officer or agency.  *See Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020); *cf. Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1376 (5th Cir. 1980).  As a result, "the [statute] creates a species of statutorily-mandated supplemental subject-matter jurisdiction."  14C Wright & Miller, *Federal Practice and Procedure* § 3726 (4th ed. 2022); *see also Baker*, 962 F.3d at 945 (same); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022) (same).  Here, that supplemental jurisdiction authorized the Court to hear Plaintiff's claims against Defendants.

Now that the Court has dismissed all of Plaintiff's claims against the United States for lack of jurisdiction, however, the question becomes whether the Court retains subject-matter jurisdiction over the claims against Defendants.  This question arises because, in analogous contexts involving supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), courts have concluded that "when a district court correctly dismisses all federal claims for lack of subject-matter jurisdiction . . . , the district court is thereby precluded from exercising supplemental jurisdiction over related state-law claims."  *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017).  If the same logic applies here, then the Court must remand the case to the Superior Court.  *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) ("When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state

court, the district court must remand the case.").

The Court concludes that it retains jurisdiction to resolve Plaintiff's state-law claims against Defendants.  That conclusion is guided by the D.C. Circuit's decision in *District of Columbia v. Merit Systems Protection Board*, 762 F.2d 129 (D.C. Cir. 1985).  There, the Merit Systems Protection Board ("MSPB")—acting under a temporary contract with the District of Columbia to adjudicate local employee administrative appeals—awarded an individual, Lee Lendt, attorneys' fees after he successfully appealed his termination from his D.C. government employment.  *MSPB*, 762 F.2d at 131.  The District petitioned for review of the fee award in Superior Court under D.C. law, naming the MSPB as respondent.  *Id.*  The MSPB removed the action to federal district court, where Lendt successfully moved to intervene as of right pursuant to Federal Rule of Civil Procedure 24.  *Id.* at 131–32.  The MSPB also "moved to dismiss the District's action on the ground that it was barred by sovereign immunity."  *Id.* at 131.  The court granted the MSPB's motion and, "[a]fter ruling that sovereign immunity prevented the District from naming the MSPB as a respondent, the district court dismissed the entire action."  *Id.*  The District petitioned the district court to "amend its dismissal order by reinstating the review proceeding against intervenor-defendant Lendt and remanding the action to Superior Court."  *Id*.  Without explanation, the district court declined to amend its dismissal order.  *Id.*

The D.C. Circuit reversed the district court's dismissal order as applied to Lendt, holding that the district court erred in "assum[ing] that the entire action must be dismissed once it determined that the District could not sue the MSPB in order to obtain judicial review of Lendt's fee award."  *Id.* at 133 n.4.  As the court explained, "[w]hen federal parties remove an action under [S]ection 1442(a)(1), the federal court assumes jurisdiction over all the claims and parties in the case regardless of whether the federal court could have assumed original jurisdiction over

9

the suit." *Id.* at 132.  Moreover, "[i]f the federal party is eliminated from the suit after removal

under this provision, the district court does not lose its ancillary or pendent-party jurisdiction

over the state law claims against the remaining non-federal parties." *Id.* at 132–33.  "Instead, the

district court retains the power either to adjudicate the underlying state law claims or remand the

case to state court." *Id.* at 133.  In other words, "[b]ecause Lendt assumed the status of an

original party upon intervention, the district court was obliged to dispose of the District's review

action against Lendt once it determined that the MSPB could not be named as a respondent in

this dispute." *Id.* at 132.  The court went on to hold, however, that "a remand to the Superior

Court [was] the appropriate course of action" because (1) "the federal party was eliminated

shortly after removal" and (2) "the District's action against Lendt implicate[d] complex local law

questions." *Id.* at 133.

  *MSPB* supports the Court's jurisdiction to resolve the remaining claims in this case.

There, as here, the federal entity removed the case from state court pursuant to 28 U.S.C.

§ 1442(a)(1).  There, as here, the district court subsequently dismissed the claims against the

federal defendant, the MSPB, on sovereign immunity grounds.  In *MSPB*, the D.C. Circuit

acknowledged that "[t]he dismissal of the District's claim against the MSPB . . . eliminated the

sole basis for removal jurisdiction and left the district court with a local law claim for judicial

review in local court over which it could not have exercised original jurisdiction." *Id.* at 132.

The same is true here: the dismissal of the United States on sovereign immunity grounds leaves

the Court with state-law tort claims against Defendants, over which the Court could have not

exercised original jurisdiction.  Applying the teachings of *MSPB*, the Court concludes that it

"retains the power either to adjudicate the underlying state law claims or to remand the case to state court."[2] *Id.* at 133.

That conclusion is also consistent with the textual differences between the supplemental jurisdiction statute, 28 U.S.C. § 1367, and Section 1442(a)(1). The former expressly provides that, "in any civil action *of which the district courts have original jurisdiction*, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (emphasis added). Courts have correctly read that provision's threshold requirement that a district court "have original jurisdiction" to mean that a district court cannot exercise supplemental jurisdiction over state-law claims if the predicate federal claim is dismissed for lack of jurisdiction—that is, if the claim that initially supplied "original jurisdiction" in the district court is later dismissed for lack of jurisdiction. *See Cohen*, 873 F.3d at 399. Section 1442(a)(1), however, contains no such proviso. And, as discussed, the Court's supplemental jurisdiction in cases involving Section 1442(a)(1) is supplied by that statute, not Section 1367. *See Baker*, 962 F.3d at 945; *Moore*, 25 F.4th 35; *see also Healthcare Venture Partners, LLC v. Anthem Blue Cross & Blue Shield*, No. 21-cv-29, 2021 WL 5194662, at *9 n.5 (S.D. Ohio Nov. 8, 2021) ("[Section] 1367 does not apply in cases where the basis of a court's initial jurisdiction is [Section] 1442(a)(1).").[3]

---

[2] The Supreme Court has reserved judgment on the question whether "a district court presiding over a multiparty removed case can invoke supplemental jurisdiction to hear claims against a party that cannot independently remove when the claims against the only parties authorized to remove are barred by sovereign immunity." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 235 n.3 (2007) (emphasis omitted). *MSPB* remains binding precedent in this circuit, however.

[3] The Court also retains Article III jurisdiction over Plaintiff's remaining claims. Prior to dismissing the United States on sovereign immunity grounds, the Court had Article III

11

The Court further concludes that a remand is not appropriate here.  The circumstances of this case differ from those that led the D.C. Circuit to conclude that a remand was appropriate in *MSPB*.  First, in *MSPB*, "the federal party was eliminated from [the] case well before any proceedings concerning either Lendt's separate jurisdictional challenge or the merits, so that judicial economy or fairness to the parties [would] not be sacrificed by a remand to local court." 762 F.2d at 133.  Here, in contrast, this case has been pending for three years.  Judicial economy and fairness therefore counsel against a remand.  Second, the court in *MSPB* observed that "Lendt's jurisdictional challenge present[ed] a complex question of purely local law," which could potentially have affected the availability of judicial review of employee appeals under the District's contract with the MSPB.  *Id.*  Here, in contrast, the case does not present such "complex" questions: Plaintiff's claims do not implicate any novel issues of D.C. law.  Indeed, to the extent a novel issue is raised, it is a question of federal law—that is, whether Defendants have raised a colorable federal defense analogous to the government contractor defense.  *Cf. Boyle v. United Tech. Corp.*, 487 U.S. 500, 504 (1988) (describing federal contractor immunity from products liability cases as "federal common law" that preempts state law).

---

jurisdiction over the case because "a significant federal question (whether [Benedict and Joyner-Bowser] ha[d] Westfall Act immunity) [was] raised at the outset," and so "the case . . . 'ar[o]se under' federal law, as that term is used in Article III."  *Osborn v. Haley*, 549 U.S. 225, 244–45 (2007).  The Court's Article III jurisdiction extended, moreover, to Plaintiff's state-law claims against Duncan and D'Eredita because all of Plaintiff's claims "derive[d] from a common nucleus of operative fact."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  The Court did not then lose the power to hear the claims against Duncan and D'Eredita when it dismissed the claims against the United States because, "[e]ven if only state-law claims remained after resolution of the federal question [whether the defendant had Westfall Act immunity], the District Court [has] discretion, consistent with Article III, to retain jurisdiction."  *Osborn*, 549 U.S. at 245; *see also Rosado v. Wyman*, 397 U.S. 397, 404 (1970) ("We are not willing to defeat the commonsense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation—by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim."); *accord Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 132 (2d Cir.2007).

The Court, accordingly, concludes that it has subject-matter jurisdiction over the remaining state-law claims in this case. The Court further concludes that a remand is not appropriate and will proceed to consider the merits of Defendants' motion.

**B.     Rule 12(b) Motion**

Defendants move to dismiss under Rule 12(b)(6), arguing that (1) their reports are "absolutely privileged because a government contractor cannot be held liable because of a report made pursuant to a governmentally-imposed duty," Dkt. 45-1 at 9; and (2) all three state-law claims fail as a matter of law, *id.* at 12–18. The Court addresses each argument in turn.

1.     *Absolute Immunity*

Defendants first argue that they are entitled to "absolute immunity" for "reporting . . . information relating to [Plaintiff's] security clearance to investigative agencies of the Department of Defense" and to BAE. Dkt. 45-1 at 1, 8. Immunity issues are typically resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The burden of establishing that Defendants are entitled to absolute immunity lies with Defendants. *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 45 (D.D.C. 2015).

According to Defendants, "a government contractor cannot be held liable because of a report made pursuant to a governmentally-imposed duty." Dkt. 45-1 at 9. Defendants further contend that they had a "governmentally-imposed duty" to report Plaintiff's website and Rhodes's protective order pursuant to the Department of Defense's National Industrial Security Program Operating Manual ("NISPOM"). *Id.* at 10. Section 1-302(a) of the NISPOM, titled "adverse information," provides that "[c]ontractors shall report adverse information coming to their attention concerning any of their cleared employees. Reports based on rumor or innuendo

should not be made."[4]  *See* National Industrial Security Program Operating Manual 24,

https://sgp.fas.org/library/nispom/nispom2006.pdf (hereinafter "NISPOM").  In an appendix, the

NISPOM defines "adverse information" as "[a]ny information that adversely reflects on the

integrity or character of a cleared employee, that suggests that his or her ability to safeguard

classified information may be impaired, that his or her access to classified information clearly

may not be in the interest of national security, or that the individual constitutes an insider threat."

NISPOM at 121.  Defendants contend that they reported adverse information about Plaintiff

pursuant to Section 1-302(a), and their reports are therefore absolutely privileged.

The Court is unconvinced that an absolute privilege applies here.  Defendants cite no

precedent from this circuit or the Supreme Court recognizing what they refer to as "the

government contractor-to-government absolute privilege."  Dkt. 45-1 at 11; *see also* Dkt. 23 at

14 (referring to the immunity defense as a "colorable federal defense").  Defendants primarily

rely on a case from the Fourth Circuit, *Becker v. Philco Corp.*, in which two individuals sued

their former employer, a defense contractor, for submitting an allegedly defamatory report about

them to the United States pursuant to regulations that required the contractor "immediately" to

report "any loss, compromise, or suspected compromise of classified information."  372 F.2d

771–72 (4th Cir. 1967).  There, the Fourth Circuit held that the company's communications were

absolutely privileged because "the company ha[d] no discretion and [was] mandatorily ordered

to report the suspicion immediately."  *Id.* at 774–75.  Although such a defense might well negate

the intent requirements of the intentional torts that Plaintiff alleges, the Court is unaware of any

controlling precedent recognizing the availability of such an immunity defense or outlining its

---

[4] The court takes judicial notice of the manual as an undisputed matter of public record.  *See*
*Citizens for Resp. & Ethics in Wash. v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019).

contours.  Rather, Plaintiff cites only to district court cases from outside of this circuit that rely

on *Becker*, *see, e.g.*, *Liverett v. DynCorp Int'l LLC*, No. 17-cv-811, 2018 WL 1533013 (E.D. Va.

Mar. 28, 2018); *Gulati v. Zuckerman*, 723 F. Supp. 353, 358 (E.D. Pa. 1989), and a Fourth

Circuit case that mentions *Becker* only in passing and in support of the much narrower

proposition that "[absolute] immunity [applies] only insofar as necessary to shield statements and

information . . . given by a government contractor and its employees *in response to queries* by

government investigators engaged in an official investigation," *Mangold v. Analytic Servs., Inc.*,

77 F.3d 1442, 1449 (4th Cir. 1996) (emphasis in original) (citing *Becker*, 372 F.2d at 771).  The

Supreme Court, moreover, has been "quite sparing in [its] recognition of absolute immunity, and

ha[s] refused to extend it any further than its justification would warrant."  *Burns v. Reed*, 500

U.S. 478, 487 (1991) (quotation marks omitted).

But even if the privilege in *Becker* is available as a "colorable federal defense," Dkt. 23 at

14, the Court concludes that the privilege does not apply here because Defendants were not

required to report Plaintiff's activities to BAE.  Notably, Defendants did not work for the same

contractor as Plaintiff, and nothing in the NISPOM provides that Defendants had an obligation to

report an employee of *another* contractor to his employer.  Instead, the NISPOM specifies that

contractors must report "adverse information . . . concerning any of *their* cleared employees."

NISPOM at 24 (emphasis added).  Defendants sidestep this distinction in their motion to dismiss

by characterizing their actions as "advis[ing] the government about the conduct of one of *its* [that

is, the government's] employees."  Dkt. 45-1 at 10 (emphasis added).  But that is not what the

NISPOM requires, and the difference is material.  Government contractors have a duty to ensure

that the services that they provide to the government are performed by employees who can be

trusted.  Understandably, however, that duty does not extend to services performed by those employed by *other* contractors.

In their reply brief, Defendants pivot to arguing that the NISPOM reporting requirements "make clear that contractors are required to report information related to their direct employees, which in this case included Ms. Rhodes."  Dkt. 49 at 4.  Defendants' argument might carry some weight if they were insisting that they reported Plaintiff's conduct as evidence that Rhodes might be subject to blackmail and, as a result, *her* "ability to safeguard classified information may be impaired."  NISPOM at 121 (defining "adverse information").  But Defendants do not make that argument.  Instead, they simply argue that the NISPOM's requirement that contractors report "adverse information . . . concerning any of their cleared employees" should be broadly construed to require Defendants to report adverse information about Plaintiff to Plaintiff's employer, merely because that information was "related to" his wife, who was a JRC employee.  That strained reading of the manual's language is unconvincing.

One further point counsels against concluding at this stage of the proceeding that Defendants are absolutely immune from suit:  Even if the NISPOM required Defendants to report Plaintiff's conduct to BAE, Defendants have not carried their burden of showing that they did, in fact, act pursuant to that requirement.  Defendants point out that the Court "has previously determined that the prior Defendants," Vice Admiral Benedict and Joyner-Bowser, "were acting in their official capacity and in the scope of their employment in reporting and investigating [Plaintiff's] actions."  Dkt. 45-1 at 11.  "For the same reasons," Defendants urge, "[they] were also acting in their capacity and in the scope of their employment as government contractors under their duty to report."  *Id.*  The key difference between Vice Admiral Benedict and Joyner-Bowser and Defendants, however, is that the United States had certified that Vice Admiral

Benedict and Joyner-Bowser were acting within the scope of their employment pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), which gave rise to "a rebuttable presumption that [Vice Admiral Benedict and Joyner-Bowser] ha[d] absolute immunity from the lawsuit and that the United States [was] to be substituted as the defendant." *Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008). No such rebuttable presumption applies in the present context. Instead, Defendants bear the burden of demonstrating that they are immune from suit, *Kenley*, 83 F. Supp. 3d at 45, and Defendants have not come close to meeting that burden: they proffer no evidence even describing the nature of their reports or how they might have been acting within the scope of their employment. Indeed, the only information available to the Court about what happened—apart from the legal arguments contained in Defendants' memoranda in support of its motion—are the allegations contained in the complaint. But those allegations, if anything, suggest that Defendants were acting outside the scope of their employment. *See, e.g.*, Dkt. 44 at 13 (Am. Compl. ¶ 85) (alleging that Defendants "improperly reported [Plaintiff's] website . . . out of personal, vengeful motive because Defendant Duncan felt [Plaintiff] was a 'problem for [him]'"). As a result, the Court cannot conclude at this juncture that Defendants are entitled to absolute immunity because they were acting pursuant to a government-mandated reporting obligation.

The Court will, accordingly, reject Defendants' argument that they are absolutely immune from suit.

> 2.   *Tortious Interference (Count I)*

In Count I, Plaintiff asserts a claim for tortious interference with his business relationship with BAE. To plead a *prima facie* case of tortious interference with a business relationship under D.C. law, a plaintiff must allege "(1) the existence of a valid contractual or other business

relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Havilah Real Prop. Servs., LLC v. VLK,* LLC, 108 A.3d 334, 345–46 (D.C. 2015) (quoting *Onyeoziri v. Spivok*, 44 A.3d 279, 286–87 (D.C. 2012)).   Defendants move to dismiss Count I on the ground that they "cannot have [had] the requisite intent of knowingly publishing a false statement, akin to libel, where the statements are true."  Dkt. 45-1 at 13.   Further, Defendants argue that Plaintiff has failed to allege "a substantial and direct causal link between any action by defendants and BAE's decision to terminate [Plaintiff]."  *Id.*  Neither argument is persuasive.

First, to plead the intent element of tortious interference, Plaintiff is not required to allege that Defendants knowingly published false statements.  The D.C. Court of Appeals has rejected any notion that proving tortious interference requires a plaintiff to show either that a defendant's conduct was "egregious"—*i.e.*, conduct "such as libel, slander, physical coercion, fraud, misrepresentation or disparagement"—or that it was "wrongful."[5]  *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 898–900 (D.C. 2008).  That does not mean that wrongfulness is irrelevant; but "[i]nstead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not."  *Id.* at 901.  Accordingly, to survive a motion to dismiss, "it is sufficient that a plaintiff's pleadings reflect that the defendant was certain or substantially certain that

---

[5] D.C. law is also unsettled as to whether truthfulness is a complete defense to a tortious interference claim.  "[D.C. law] of tortious interference with business or contractual relationships derives from the Restatement (Second) of Torts," *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1038 (D.C. 2015), and Section 772 of the Restatement explains that there is "no liability for interference with a contract . . . on the part of one who merely gives truthful information to another," Restatement (Second) of Torts § 772 cmt. b (Am. L. Inst. 1979).  But the D.C. Court of Appeals "has never explicitly adopted § 772," and it has referred to the question as "not an uncomplicated one" while noting that "other jurisdictions have declined" to adopt § 772. *Armstrong v. Thompson*, 80 A.3d 177, 191 n. 8 (D.C. 2013).

interference with a business relationship would occur as a result of the defendant's actions." *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 141 n.28 (D.C. 2021).  Here, Plaintiff alleges that Defendants reported Plaintiff's website as a security risk to Plaintiff's employer, Dkt. 44 at 7 (Am. Compl. ¶ 36), and that Plaintiff had his security clearance revoked as a result, *id.* at 9 (Am. Compl. ¶ 55).  Taking these allegations as true, the Court can plausibly infer that Defendants "knew that interference [with his employment at BAE] was certain or substantially certain to occur."  *Id.* at 11 (Am. Compl. ¶ 72).

Second, and contrary to Defendants' assertions, the amended complaint contains allegations that Defendants caused the revocation of his security clearance—and his ultimate termination—by reporting him as a security risk to BAE.  *See, e.g.*, *id.* at 12 (Am. Compl. ¶¶ 76– 80).  The crux of Defendants' causation argument is that Plaintiff's allegations must be insufficient because they are contradicted by Plaintiff's "conce[ssion] that his actions related to his website and the resulting Protective Order were the cause of his termination and damages." Dkt. 45-1 at 13.  But Plaintiff does not so concede—he merely alleges that Defendants' reports were about his website and the protective order.  To be sure, it is entirely possible that Plaintiff's website and the protective order served as adequate grounds for BAE's adverse employment actions.  But "the fact that [BAE] had an independent reason for firing [Plaintiff] is in no way dispositive to the question of liability for tortious interference."  *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1040 (D.C. 2015).  It is plausible, for example, that BAE relied not only on Plaintiff's website and the protective order, but also on the fact that Defendants—two senior JRC officials, including D'Eredita, who served as "Director of Facilities and Security," Dkt. 44 at 6 (Am. Compl. ¶ 34)—expressed the view that this information posed a "security risk to BAE," *id.*

at 7 (Am. Compl. ¶ 36).  The complaint thus raises a factual question that is not properly addressed at this stage.  *See Newmyer*, 128 A.3d at 1040.

Accordingly, the Court will deny Defendants' motion as to Count I.

2. *Intentional Infliction of Emotional Distress (Count II)*

Plaintiff also asserts a claim for intentional infliction of emotional distress ("IIED"), alleging that "the constant nature of [Defendants'] reporting, and its continual impact on [Plaintiff's] personal and professional life, caused [Plaintiff] severe emotional distress" and constituted "extreme and outrageous" conduct.  Dkt. 44 at 13–14 (Am. Compl. ¶¶ 88, 92).  To state a claim for IIED under D.C. law, Plaintiff must allege "(1) extreme and outrageous conduct on the part of [Defendants] which (2) either intentionally or recklessly (3) cause[d] [him] severe emotional distress."  *Halcomb v. Woods*, 610 F.Supp.2d 77, 80 (D.D.C. 2009) (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002)).

Defendants contend that Count II must be dismissed because the allegations in the amended complaint "do not rise to the level of outrageousness required to state a claim for [IIED]."  Dkt. 45-1 at 14–15.  To plausibly allege "extreme and outrageous conduct," Plaintiff must allege facts sufficient to show that Defendants committed acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991)).  "This is a 'very demanding standard' [that] is 'only infrequently met.'"  *Holloway v. Howard Univ.*, 206 F. Supp. 3d 446, 453 (D.D.C. 2016) (quoting *Dale v. Thomason*, 962 F. Supp. 181, 184 (D.D.C. 1997)).  Moreover, under D.C. law, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be

regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so."
*Newmyer*, 128 A.3d at 1037 (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994)).
But, "[w]here reasonable persons may differ, the question must go to the jury 'to determine
whether, in the particular case, the conduct has been sufficient[ly] extreme and outrageous to
result in liability.'" *Id.* (quoting *Drejza*, 650 A.2d at 1316).

Taking Plaintiff's allegations as true, and drawing all reasonable inferences in his favor,
the Court concludes that he has alleged enough—although just enough—to support a plausible
IIED claim. Whether a defendant's conduct is extreme and outrageous "depends on the facts of
each case," including "the motivation of the [defendant]" and "whether the [plaintiff] was
especially vulnerable and the [defendant] knew of the vulnerability." Restatement (Third) of
Torts: Liability for Physical and Emotional Harm § 46 cmt. d (Am. L. Inst. 2012). At this early
stage of the proceeding, both factors at least arguably tip in Plaintiff's favor. First, as to
Defendants' motivation, Plaintiff alleges that Defendants reported his website and Rhodes's
protective order to BAE "out of personal, vengeful motive because Defendant Duncan felt
[Plaintiff] was a 'problem for [him].'" Dkt. 44 at 13 (Am. Compl. ¶ 85). That allegation is also
significant because it defeats Defendants' principal argument for dismissing Count II: that
"plaintiff has not alleged any facts to demonstrate that [D]efendants acted in any manner other
than a clearly legitimate reason." Dkt. 45-1 at 15. Second, as to Plaintiff's vulnerability, he
alleges that Defendants knew of his emotional state at the time, Dkt. 44 at 13 (Am. Compl.
¶ 87)—that is, that he was experiencing "distress over his marriage" and Duncan's "actions
regarding . . . Rhodes and his marriage," which was the subject of his "website biography," *id.* at
5–6 (Am. Compl. ¶¶ 25, 29). At the pleading stage, then, the Court cannot rule out the
possibility that "reasonable persons may differ" over whether, "in [this] particular case, the

conduct has been sufficiently extreme and outrageous to result in liability." *Newmyer*, 128 A.3d at 1043 (alterations omitted) (quoting *Drejza*, 650 A.2d at 1316). This close question is better suited for resolution on summary judgment or, if appropriate, trial on the merits.

A word of caution is in order. Although Plaintiff has alleged facts sufficient to state an IIED claim, the Court's decision does not signal that Plaintiff will necessarily meet the "very demanding standard" for demonstrating extreme and outrageous conduct at summary judgment or at trial. *Holloway*, 206 F. Supp. 3d at 453. It will not be enough, for instance, for Plaintiff simply to show that he suffered severe emotional harm as a result of Defendants' "otherwise legitimate conduct." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46 cmt. a. "A great deal of conduct may cause emotional harm, but the requisite conduct for this claim—extreme and outrageous—describes a very small slice of human behavior." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 46 cmt. a. Plaintiff's burden will be to demonstrate that Defendants' conduct fits within that "small slice of human behavior" that implicates tort liability.

Accordingly, the Court will deny Defendants' motion to dismiss Count II.

3.     *Defamation (Count III)*

In Count III, Plaintiff asserts a claim of defamation against Defendants. To state a claim for defamation under D.C. law, a plaintiff must plead "four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140–41 (D.D.C. 2017) (quoting

*Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)).  Defendants move to dismiss Plaintiff's defamation claim on the ground that "[t]he statements that are the basis of plaintiff's defamation claim are not actionable because Plaintiff in his Amended Complaint admits that they are true." Dkt. 45-1 at 15.  In response, Plaintiff argues that "Defendants made false and defamatory statements about [Plaintiff] by reporting a meritless protective order to BAE and the Navy Vice Admiral."  Dkt. 46-1 at 19.

The Court agrees with Defendants that Plaintiff fails to allege any false or defamatory statements regarding the protective order.  According to documentation that Plaintiff submitted with his complaint, Rhodes obtained a preliminary protective order on January 9, 2017, which prohibited Plaintiff from having "contact of any kind" with her.  Dkt. 44-9 at 2 (preliminary protective order).  Plaintiff alleges that Defendants reported him as a security risk to BAE in "early February 2017," while the preliminary protective order was likely still in place.  Dkt. 44 at 9 (Am. Compl. ¶ 36).  A formal protective order was issued on February 27, 2017.  *See* Dkt. 44-12 (order dissolving protective order).  Although, in Plaintiff's view, the protective orders may have been "meritless," as evidenced by their dissolution on June 29, 2017, *see id.*, nothing in the amended complaint suggests that they were invalidly entered, or that Defendants somehow misrepresented the situation to BAE when they reported the protective order.  The later dissolution of the protective order does not render Defendants' report false or defamatory.

The Court also concludes that the remaining allegations in Plaintiff's complaint are insufficient to state a claim for defamation.  Plaintiff alleges that Defendants' statements about Plaintiff, "as reported, are false and defamatory"  and that he "reasonably believes that Defendants['] statements in the initial report, which he has not received, contain[] false and defamatory statements regarding himself and his website."  Dkt. 44 at 15 (Am Compl. ¶ 96).

The problem with those allegations is that Plaintiff fails adequately to describe, and the Court cannot infer, "either the language or the substance of the [allegedly defamatory] statements." *Oparaugo v. Watts*, 884 A.2d 63, 77 (D.C. 2005) (citing *Watwood v. Credit Bureau, Inc.*, 68 A.2d 905, 906 (D.C. 1949)).  Plaintiff admits to publishing his website and that it "included a reference to his current work in relation to the SSP."  Dkt. 44 at 5–6 (Am. Compl. ¶ 29). Accordingly, if Defendants merely reported the existence of Plaintiff's website, that report could not have been false.  It may be true that Defendants made additional statements about Plaintiff's website—statements that were inaccurate—but the amended complaint fails to mention any such statements, and the Court cannot infer whether such statements were made or what was said.

The amended complaint also alleges that Duncan "misrepresented that [Plaintiff] and Mrs. Rhodes were already divorced to the Navy, and used this misrepresentation to request and receive advanced warning of [Plaintiff's] travel to the work site."  *Id.* at 7 (Am. Compl. ¶ 40). But Plaintiff concedes that he and Rhodes were "separated" at the time.  Dkt. 44-8 at 3.  The amended complaint contains no allegations indicating that this distinction had any effect on BAE or JRC's treatment of Plaintiff; indeed, text messages from Duncan, which Plaintiff appended to his complaint, *see id.*, indicate that Duncan's objective was to convey his view that "it would be best for [Plaintiff and Rhodes] to not be in Florida together," and that the recipient of that message agreed, *id.* at 2.  Duncan's statement does not rise to the level of being "defamatory," even if it was technically false.  *See Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001) ("[A]n allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiffs appear odious, infamous, or ridiculous." (quoting *Howard University v. Best*, 484 A.2d 958, 989 (D.C. 1984))).

The Court will, accordingly, dismiss Count III.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Dismiss, Dkt. 45, is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that Defendants' motion to dismiss Counts I and II of the amended complaint is **DENIED**; and, it is further

**ORDERED** that Count III of the amended complaint is **DISMISSED.**

 **SO ORDERED**.


 /s/ Randolph D. Moss
 RANDOLPH D. MOSS
 United States District Judge


Date:  July 15, 2022